# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

| | | |
|---|---|---|
| **MICHAEL CHRESTMAN** | ) | |
| | ) | |
| **As Next Friend to MELISSA WOODEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.** |
| **vs.** | ) | |
| | ) | |
| **METROPOLITAN GOVERNMENT** | ) | |
| **OF NASHVILLE-DAVIDSON** | ) | **Judge** |
| **COUNTY, TENNESSEE,** | ) | |
| | ) | **Magistrate Judge** |
| **And** | ) | |
| | ) | |
| **BENJAMIN WILLIAMS** | ) | |
| | ) | **JURY DEMAND** |
| **And** | ) | |
| | ) | |
| **BRANDON LOPEZ** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

1. **Plaintiff Michael Chrestman** ("Plaintiff") brings this federal civil rights claim for damages as **Next Friend to Ms. Melissa Wooden** ("Ms. Wooden") against **Defendant Metropolitan Government of Nashville-Davidson County, Tennessee** ("Metro"), **Defendant Benjamin Williams** ("Williams"), and **Defendant Brandon Lopez** ("Lopez"). Plaintiff's claims arise from a March 12, 2021 incident in which Defendant Williams shot Ms. Wooden with a taser, and then Defendant Lopez shot Ms. Wooden multiple times with a gun. Ms. Wooden survived the shooting, but suffered severe injuries requiring extensive medical treatment.

## PARTIES

2.  Plaintiff Michael Chrestman is the adult male brother and legally authorized conservator of Ms. Melissa Wooden.

3.  Ms. Wooden is an adult female resident of Davidson County, Tennessee.

4.  Defendant Metro is a government entity organized under the laws of the State of Tennessee and located in Davidson County, Tennessee.

5.  Defendant Williams is an adult resident of Davidson County, Tennessee.

6.  Defendant Lopez is an adult resident of Davidson County, Tennessee.

## JURISDICTION AND VENUE

7.  This Court has federal question jurisdiction over the federal claims in this matter pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the Tennessee state claims pursuant to 28 U.S.C. § 1367.  Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2) because all claims related to this case occurred in this district.

## FACTUAL BACKGROUND

### A.  Defendant Metro Exercises its Law Enforcement Function through the Metropolitan Nashville Police Department

8.  Defendant Metro is a merged city-county municipal entity, with one unified government exercising governance authority over the city of Nashville and Davidson County.

9.  Metro's governing charter allocates primary municipal governing authority to an elected Mayor ("the Mayor") and an elected 40-member City Council.

10. Metro's governing charter establishes the Metropolitan Nashville Police Department ("MNPD") as the exclusive law enforcement agency in Nashville – Davidson County.

11. Metro's charter establishes a Chief of Police ("the Chief") to lead MNPD, and empowers the Chief with unilateral authority, subject only to the Mayor's consent and any legal restrictions, to direct MNPD's operations, policies, training, strategy, and internal disciplinary systems and determinations.

**B.  MNPD's Culture of Fear and Violence**

12. From at least 2010 until March 2017, MNPD provided each new MNPD academy recruit-trainee a 1986 book entitled "The Tactical Edge."

13. The Tactical Edge opens with the dedication that it is for "Officers who want to win."

14. The Tactical Edge continues with a picture of a white male police officer comforting another white male police officer who has just shot and killed a black man.

15. The Tactical Edge next turns to a picture of four slain white police officers, accompanied by text indicating that the officers were "wasted" because they were "careless."

16. The Tactical Edge goes on to paint a dystopian picture in which police officers will be killed in the streets by a generation raised in daycare and "violent" minorities unless police adopt the book's prescribed mental attitude and tactical approach.

17. The Tactical Edge asserts that "there is a greater capacity for violence on the street today than ever before," and that the only thing keeping officers from getting killed by citizens is that officers are now "aware of the adversary's ways and will … and more dedicated to the mental attitudes and tactical maneuvers that can defeat his violent intent."

18. The Tactical Edge continues, "THE GAP BETWEEN THE TRAINING YOU GET SPOON-FED AND WHAT YOU NEED TO SURVIVE ON THE STREET IS LEFT UP TO YOU TO FILL. That gap does not have to be very wide to make you vulnerable.  Just wide enough for an offender to fire a bullet through." (Caps in original).

19. The Tactical Edge claims that "serious violent offenders" are being released from prison too quickly, and that "most convicts will be back on the streets, better schooled legally, better conditioned physically, and better equipped tactically." Accompanying this assertion are photographs of black men lifting weights in prison, plotting a prison break, and being released from prison early due to overcrowding.

20. The Tactical Edge continues, "More than half the population growth in this country in the next 20 years will come from ethnic minority groups, which have the highest ratio of law enforcement contact and are disproportionately associated with criminal violence."

21. The Tactical Edge continues, "Pre-schoolers left in day-care centers are 15 times more aggressive than other youngsters… their behavior is not just more assertive but involves physical violence, verbal abuse, and resistance to authority. The public schools, meantime, report growing numbers of a 'new kind of child' with 'different values' and profound problems that our schools are ill-equipped to handle."

22. The Tactical Edge dismisses officers who express skepticism about the book's dystopian, hyper violent worldview as "veteran hairbags."

23. The Tactical Edge's introduction closes with the statement, "On the street, you will meet the human beings, the weapons, the mentalities behind the dismal facts above. They are waiting for you. Either you or they will have the edge."

24. The Tactical Edge goes on to prescribe mental attitudes and tactics for defeating the identified "adversaries" – i.e., people of color and kids raised in daycare – and then closes with a presentation of several "model" officers.

25. One of The Tactical Edge's model officers states, "Everybody I approach, everybody I stop, every situation, I always expect the worst. That way, in case it goes down I'm

4

ready. If it doesn't, no big deal... at least I was covered. I maintain the attitude that the next guy might be the guy that wants to take me out, no matter what he looks like."

26. Another of <u>The Tactical Edge</u>'s model officers states, "Every shift I set a goal: I plan to make at least one in-custody arrest. If I don't make an arrest that night, I try to have two the next.... It affects my mental attitude. When I'm approaching somebody on a T-stop and looking at him as a potential arrest, it does a couple of things. One, it puts him immediately in the suspect mode. And two, it sharpens my visual awareness... I'm looking for something to arrest this guy on.... That really keeps me motivated. It makes me do more traffic stops, because if I haven't made my arrest, I have to keep contacting people until I do. I've made up to 50 and 60 stops a night. When I get an early arrest, I say, 'Okay, let's see if I can get three tonight.'"

27. Another of <u>The Tactical Edge</u>'s model officers states, "I probably am a little paranoid, but I think if you're a cop and you're not a little paranoid, you better not be a cop.... Before I go to work every day, I draw my gun out of the holster and dry-fire it 25 times in front of a mirror, so I can see what it looks like. ... Some people say, '[I am] really crazy.' But let me tell you what, if I ever come to a situation where I have to do that, I'm going to know what I'm going to do." The officer continues, "When it comes down to surviving, you shouldn't be worrying about lawsuits. That's why you take preparation. You put stuff in your wife's name. You buy some additional liability insurance. You join the union so you've got a good attorney on retainer. You prepare yourself to survive a legal assault just as you do a street assault. And you fight back the same, too.... Out on that street, I'm my number one priority. My partner out there is number two. My family's number three. The department's number four. The bad guy's last."

28. The Tactical Edge closes with a picture and caption criticizing prisoners for using their recreational reading time in prison to study the law.

29. In addition to The Tactical Edge, MNPD's other training programs reinforce the message that officers should fear the citizens they encounter on a daily basis.

30. MNPD's traffic stop training materials highlight the one-in-several-million occurrence of an officer being shot during a traffic stop.

31. MNPD's traffic stop training materials also emphasize that officers should treat every citizen they pull over as a potential dangerous "felon," and instill the mantra that "there is no such thing as a routine traffic stop."

32. MNPD's training program teaches officers that in order to stay safe during encounters with citizens, the officer must be in verbal or physical control of the citizen at all times.

33. MNPD's training teaches that officers who use their firearms against citizens deemed to be lethal threats should always shoot "center mass," *i.e.* aim for the heart and lungs, and that officers should continue firing until the citizen is "neutralized."

34. MNPD's deadly force training includes a "Shoot – Don't Shoot" simulator, in which the rules state that an officer who fails to kill a citizen when the officer "should" results in the officer being virtually killed.

35. From 2015 – October 2020, MNPD officers shot and killed eight people.

## C. Efforts to Reform MNPD

36. Several of the deaths caused by MNPD resulted in public outcry, particularly the killings of Mr. Jocques Clemmons in February 2017 and Mr. Daniel Hambrick in July 2018.

37. The February 2017 killing of Jocques Clemmons triggered the creation of a grassroots movement to establish a "Community Oversight Board" ("COB") to oversee MNPD's interactions with citizens.

38. Metro opposed the creation of a COB, to which the grassroots movement responded in 2018 by filing a a citizens' petition for a referendum to establish such an institution.

39. The July 2018 killing of Mr. Hambrick fueled the COB movement, resulting in a landslide referendum victory for the proposal in the fall of 2018.

40. One of the chief concerns raised by the COB movement was that MNPD's internal officer investigation and disciplinary system failed to provide meaningful accountability for officer violations of citizens' civil rights, instead effectively serving to justify officers' civil rights violations with impunity.

41. With regard to the killing of Mr. Hambrick in particular, MNPD initially attempted to justify it.

42. However, the officer who killed Mr. Hambrick was ultimately prosecuted for First Degree Murder, and was convicted – on a plea of guilt – of Voluntary Manslaughter.

43. Mr. Hambrick's estate filed a civil claim against the officer and Metro for Mr. Hambrick's murder, which Metro ultimately settled for $2.25 million.

44. Throughout the period 2015 – 2021, in addition to the COB movement community organizations such as Nashville Organized for Action and Hope ("NOAH") pushed for specific reforms in the way that MNPD handles mentally ill subjects.

45. One of the key reforms pushed for by the community was to implement "Crisis Intervention Teams," ("CIT") utilizing a "co-response model" in which mental health counselors would respond to mental health emergencies in concert with police.

46. Starting in 2017, government agencies such as, *inter alia*, the Metro Human Relations Commission and Department of Justice Community Relations Service recommended that MNPD reform its policies and training methods related to use of force, mental health emergencies, and review of citizen claims of civil rights violations by officers.

47. On August 14, 2020, the Mayor announced the creation of a "Policing Policy Commission," ("the Commission"), for the purpose of reviewing MNPD's use of force policies and recommending revisions to those policies.

48. In making this announcement, the Mayor stated that "The first purpose of the Commission is to identify ways for the Metro Nashville Police Department to reduce the use of force."

49. On November 20, 2020, the Mayor's office published the Policing Policy Commission Report, documenting the findings and recommendations of the Commission.

50. The Commission found several problems with MNPD's policing methods, and issued several recommended solutions to those problems.

51. One of the problems the Commission identified was that police "serve[d] as first responders to mental health and addiction crises even though police are not clinically trained to address these crises and refer individuals to appropriate services."

52. To address this problem, the Commission recommended that MNPD "Establish a co-response model to mental health crises for Nashville by creating a Crisis Intervention Team (CIT) unit in the MNPD and selecting officers interested in serving in the unit; ensure that mental health professionals serve as co-responders and, where possible, lead interventionists."

53. The Commission also recommended that MNPD "Continue to partner with the Mobile Crisis Unit and refer to the Crisis Treatment Center operated by the Mental Health Cooperative."

54. The Commission recommended that these solutions be implemented "Immediately."

55. The Commission also found that MNPD fulfilled only four of the eight "#8cantwait"[1] use of force policy requirements.

56. The four unfulfilled policy requirements were:

   a. Require de-escalation;

   b. Duty to intervene;

   c. Ban Shooting at Moving Vehicles; and

   d. Require Comprehensive Reporting.

57. The Commission recommended that MNPD's use of force policy be modified to require de-escalation, and to require that physical force be used only as the "last resort."

58. The Commission also found that MNPD needed to stop teaching "Excited Delirium" at the Police Training Academy, a controversial term that has been used to justify excessive force against mentally ill individuals.

59. To further address this problem, the Commission recommended that MNPD partner with Metro Emergency Medical Services ("EMS") and Mobile Crisis to develop protocols ensuring the safety of the individuals, the officers, the community, and the EMS providers. The Commission also specifically recommended, "If, at the scene of an incident, officers suspect a medical emergency, call for EMTs and trained mental health providers to assess each suspect and recommend appropriate course of action."

---

[1] https://8cantwait.org/.

60. The Commission called for these reforms to be implemented "Immediately."

61. The Commission also recommended modification of MNPD's training program to "emphasize de-escalation and less use of deadly force by officers."

62. The Commission also recommended that MNPD better "Cooperate with Metro Nashville Community Oversight (MNCO)," the agency that had been established by the successful Community Oversight referendum.

63. The Commission asserted that better cooperation with MNCO would help MNPD achieve numerous important reforms, including, inter alia, the use of de-escalation techniques as a prerequisite to the use of force and enhanced "policies regarding agency referrals regarding mental health."

64. The Commission also made several recommendations for changes in MNPD's Use of Force policy, including a mandatory requirement that any time officer force "results in the admission to the hospital, remove officers from the line of duty and field assignments until a formal investigation has been completed."

65. While some Metro and MNPD officials expressed support for the proposal, as of March 12, 2021 MNPD had failed to establish such teams in most of its precincts, and in particular the Madison precinct, instead relying on a pure law enforcement approach to attempt to resolve mental health crises.

### D. Defendants Tase and then Gun Down Ms. Wooden

66. On March 12, 2021, during the day, Ms. Wooden experienced a mental health crisis.

67. Ms. Wooden called 911, gave her address, and said she wanted police to come so that they could shoot her.

68. MNPD dispatched Defendant Williams, Defendant Lopez, and MNPD Officer Thomas Denenea to deal with Ms. Wooden.

69. Defendant Williams drove to the address provided. *En route*, he remarked "It sounds like she's looking for attention."

70. As Defendant Williams neared the scene, he was informed over dispatch that Ms. Wooden had a "pickaxe" and a "baseball bat."

71. Defendant Williams parked, got out of his car, and approached Ms. Wooden.

72. Ms. Wooden was standing in a grassy field alongside Greer Road, within a few feet of an MNPD patrol car. She was holding a baseball bat and a pickaxe.

73. Defendants approached Ms. Wooden to a distance of about fifteen feet, and ordered her to get away from the MNPD car.

74. Defendant Lopez drew his firearm, and Officer Denenea drew his taser.

75. Ms. Wooden backed up from the Defendants and the car, as ordered.

76. Defendant Williams repeatedly told Ms. Wooden that none of the officers would hurt her.

77. Defendant Williams told Ms. Wooden that he had no reason to pull a weapon on her, because there was distance between them.

78. Defendants continued in a standoff with Ms. Wooden at roughly the same distance for several minutes, while Williams continued talking to her.

79. At about five minutes into the encounter, Ms. Wooden's mother ("the mother") drove an electric cart down the driveway and parked near Defendant Williams.

80. The mother explained to the Defendants that Wooden was mentally ill, that she was not a bad person but that she was sick.

81. Ms. Wooden responded to this by backing off again, putting Defendants further away from her than they had been before the mother arrived.

82. Defendant Williams assured the mother that the officers would resolve the situation with her daughter peacefully.

83. Ms. Wooden continued backing off, while Defendants continued moving toward her and maintaining approximately the same distance.

84. The mother suddenly drove her cart up toward Ms. Wooden, which Ms. Wooden again reacted to by backing further away from the mother and the officers.

85. Defendant Williams ordered the mother to stop, and she did so. Wlliams then ordered the mother to back up, which she did.

86. Meanwhile, Ms. Wooden continued slowly backing off, while Defendants continued slowly approaching her and maintaining the same distance.

87. Suddenly, and for no apparent reason, Defendant Williams pulled out his taser, motioned to the other officers, shouted "Tase her tase her tase her!" and fired his taser at Ms. Wooden.

88. Defendant Williams was aware that Defendant Lopez had already drawn his firearm when he motioned to the other officers and tased Ms. Wooden.

89. At least one of Defendant Williams's taser projectiles hit Ms. Wooden, causing Williams's taser to electrocute her.

90. Defendant Lopez reacted to this sudden development by shooting his firearm at Ms. Wooden three times.

91. Two of Defendant Lopez's bullets hit Ms. Wooden – one in the stomach, and one in the shoulder.

92. Ms. Wooden collapsed on the grass immediately after being shot.

93. Williams reported over his radio to MNPD that shots had been fired.

94. The mother confronted the Defendants for shooting her daughter.

95. Williams responded by immediately justifying the shooting, claiming that Wooden had been "charging" them.

96. Williams called MNPD to request emergency medical assistance.

97. An ambulance responded quickly to the scene, and Ms. Wooden was taken to the emergency room.

98. Defendant Williams told Defendant Lopez to get into his car and not talk to anyone.

99. Defendant Williams had several conversations with Nashville Fire Department personnel who had responded to the scene, explaining that the Defendants had "cornered" Ms. Wooden, that she had backed off from the MNPD car, and that Williams had "just decided to tase her."

100.     Williams stated that the tasing did not work, that Wooden had "c[o]me at him with a pickaxe," and that Lopez had shot her in response.

101.     Defendant Williams again talked to the mother, who told him that what had happened was "wrong" and demanded to know the name of the officer who shot her daughter.

102.     Williams said that the mother would get the name of the shooter later, and that he could not speak to what Lopez's state of mind was in making the decision to shoot Ms. Wooden.

103.     Defendant Williams talked to Officer Denenea, and explained that he (Williams) had been trying to motion Denenea and Lopez to just tase Ms. Wooden – not shoot her with bullets – because the situation "wasn't going anywhere."

104.    Defendant Williams then spoke with a few other MNPD officers that arrived on the scene after the shooting.

105.    Williams told the other officers to leave Lopez alone.

106.    The officers then asked Williams if he was ok.

107.    Williams told the officers that he was just "Keeping it together keeping it together," and that as he was driving to the scene he had been saying to himself "I'm so stressed out right now. Like just in life – in general."

108.    One officer responded that Williams sounded completely calm on the radio, as calm as in a previous incident in which Williams reported that someone had "just slit his throat."

109.    Williams laughed in response to this comment, then said "It's not funny, um…"

110.    Williams then returned to the mother, and spoke with her again.

111.    The mother asked, "Why did [Lopez] do it? I don't understand."

112.    Williams responded, "He perceived that as… you know what I don't think right now I'm qualified to answer. Because it's his state of mind. I saw it the way I saw it, he saw it the way he saw it."

113.    The mother asked Williams what Wooden had said when she called the police. Williams explained that she said she wanted to die, but clarified that "We get that a lot."

114.    Two MNPD sergeants then arrived on the scene, took control, and questioned Williams about what had happened.

115.    Williams told the supervisors that Wooden did not appear to be on drugs, but was just mentally off.

116.    Williams told the supervisors that he had explained to Wooden that no one would shoot her.

117.     Williams said that the officers had fanned out, and Lopez had gone "lethal" while Denenea had gone "non-lethal."

118.     Williams said that the officers had "triangled" Wooden away from the car and into the yard.

119.     Williams explained that after several minutes Williams "g[a]ve up," pulled his taser out, tried to motion to Officer Denenea to tase her, yelled "Tase her tase her tase her," and "popped" Ms. Wooden.

120.     As he explained what had happened, Williams admitted that his team apparently needed more practice interpreting signals, as he had not meant to signal Lopez to shoot Ms. Wooden – just for Denenea to tase her.

121.     Williams said that tasing Wooden was not effective, and that she reacted to being "popped" by running toward him with a pickaxe.

122.     Williams said that he did not draw his gun during the incident at all, and said that the fact that he did not draw his gun spoke to his state of mind as to whether or not he was in fear that Wooden would kill him.

123.     Williams stated that Lopez saw his decision to shoot Wooden as defending Williams, because when Williams tased Ms. Wooden it "pissed her off."

124.     Ms. Wooden was taken to Vanderbilt hospital, where she received medical treatment for the injuries Defendants had inflicted on her.  Ms. Wooden did not die from these injuries, but her injuries were severe and required prolonged medical treatment.

125.     Ms. Wooden spent two months in the hospital, and underwent several surgeries.

126.     Ms. Wooden suffered from multiple different infections, and had to use a colostomy bag for several months.

127.     Ms. Wooden ultimately lost two inches of her colon.

128.     Ms. Wooden suffered permanent spinal damage, causing her to experience permanent back pain.

129.     Ms. Wooden's mental health, already fragile before the incident, suffered severely from the trauma of being tased, shot, and then living through the ensuing medical issues.

### E.  MNPD's Belated, Inadequate Reforms

130.     In April 2021, MNPD's "Community Services Bureau" awarded Defendant Lopez and Officer Denenea "Officer of the Month" awards.

131.     On June 21, MNPD announced a new "Partners in Care" program, a pilot project in two precincts – North and Hermitage – in which MNPD would partner with Mental Health Coop to have mental health professionals ride in patrol cars to assist with mental health emergencies.

132.     On July 23, 2021, MNPD released an updated Use of Force policy incorporating some, but not all, of the Commission's recommendations.

133.     MNPD's new policy required de-escalation, but failed to require that physical force be used as the "last resort."

134.     MNPD continued training officers on the "Excited Delirium" term.

135.     On August 19, 2021, MNCO issued a report entitled, "Evaluation of MNPD's Use of Force Policy Revision For Consistency with Policy Recommendations."

136.     MNCO's "Evaluation" found that MNPD's new policy failed to comply with the recommendations made by the Commission and MNCO in several respects, in particular failing to require that force be used only as a "last resort."

## CLAIMS FOR RELIEF

### COUNT I: EXCESSIVE FORCE IN
### VIOLATION OF THE FOURTH AMENDMENT
### (42 U.S.C § 1983)

### (ALL DEFENDANTS)

137.     Plaintiff hereby reincorporates paragraphs 1 – 136 by reference.

138.     On March 12, 2021, Defendant Williams used excessive, unreasonable force by tasing Ms. Wooden when she posed no threat of imminent harm, was not fleeing an arrest, and was not actively resisting arrest.

139.     Defendant Lopez used excessive, unreasonable force by shooting Ms. Wooden with a firearm multiple times when she posed no threat of imminent harm, was not fleeing an arrest, and was not actively resisting arrest.

140.     Defendants were acting under color of state law when they tased Ms. Wooden and then gunned her down.

141.     Defendant Metro caused its officers to tase Ms. Wooden and gun her down by:

   a.   Engendering an MNPD officer culture of fear, violence, and impunity;

   b.   Failing to reform MNPD's use of force and mental health emergency policies on the heels of unlawful officer-involved shootings and calls for policy reform by community grassroots organizations and myriad dgovernment agencies.

   c.   Disregarding the evidence that MNPD's internal disciplinary system treated officer violations of civil rights with impunity.

   d.   Failing to adequately train and prepare Defendants to handle a situation like the one that led to them to tase and gun down Ms. Wooden.

142.     Defendants Williams and Lopez acted intentionally and with reckless disregard

for Ms. Wooden's rights by tasing her and then gunning her down.

143.     Ms. Wooden suffered physical, legal, emotional, Constitutional, and financial

harm by being tased and then gunned down.


COUNT II: NEGLIGENCE

(Defendant Metro)

144.     Plaintiff hereby reincorporates paragraphs 1 – 136 by reference.

145.     On March 12, 2021, Defendant Williams gave confusing signals to Defendant

Lopez, which Lopez interpreted as a signal to shoot Ms. Wooden with his firearm.

146.     Defendant Lopez responded to this miscommunication by shooting Ms. Wooden

with his firearm two times.

147.     Defendants Williams should have known that his actions would create an

unreasonable risk of causing Lopez to shoot Ms. Wooden with his firearm.

148.     Metro is liable for the negligent actions of its officers.

149.     Ms. Wooden suffered physical, emotional, and financial harm by being gunned

down.

## **REQUEST FOR RELIEF**

WHEREFORE, these premises considered, Plaintiff prays:

1. That the Defendants Answer this Complaint within the time provided by law.

2. That this cause be tried by a jury.

3. That judgment for Plaintiff enter against the Defendants on each count.

4. That Plaintiff be awarded nominal damages on all counts.

5. That Plaintiff be awarded compensatory damages in an amount determined by the jury.

6. That Plaintiff be awarded punitive damages.

7. That Plaintiff be awarded his attorney's fees and reasonable litigation expenses, including expert witness fees, pursuant to 42 U.S.C. § 1988 and F.R. Civ. Pro. 54(d).

8. That the court costs in this matter be taxed to Defendants.

9. That Plaintiff be awarded pre- and post-judgment interest against Defendants.

10. That Plaintiff be awarded all other relief to which it may appear he is entitled in the interests of justice.


**Respectfully submitted**,

_s/ Joy Kimbrough_
Joy S. Kimbrough, BPR 025009
5570 Knob Road
Nashville, TN 37209
T: (615) 512-0933 / F: (615) 953-7715
E: joykimbrough@gmail.com

_s/ Kyle Mothershead_
Kyle Mothershead, BPR 22953
Relentless Advocacy, PLLC
2901 Dobbs Ave.
Nashville, TN 37211
T: (615) 212-5036 / F: (615) 229-6387
E: kyle@relentlesslaw.com