## UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| Kelly L. Stephens<br>Clerk | 100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988 | Tel. (513) 564-7000<br>www.ca6.uscourts.gov |

Filed: September 16, 2025

Ms. Allison L. Bussell
Ms. Melissa Roberge
The Metropolitan Government of Nashville & Davidson County
Department of Law
P.O. Box 196300
Nashville, TN 37219-6300

Mr. Kyle Fite Mothershead
Relentless Advocacy
7000 Executive Center Drive
Suite 240
Brentwood, TN 37027

Re: Case No. 24-6018, *Michael Chrestman v. Metro Govt of Nashville, et al*
Originating Case No. : 3:22-cv-00173

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Kelly L. Stephens, Clerk

Cathryn Lovely
Deputy Clerk

cc: Ms. Lynda M. Hill

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0255p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

MICHAEL CHRESTMAN, as Next Friend to Melissa Wooden,

    *Plaintiff-Appellant*,

    *v.*

METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE; BENJAMIN WILLIAMS; BRANDON LOPEZ,

    *Defendants-Appellees*.

No. 24-6018

---

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:22-cv-00173—William Lynn Campbell, Jr., District Judge.

Argued: June 11, 2025

Decided and Filed: September 16, 2025

Before: GILMAN, DAVIS, and MATHIS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Kyle Mothershead, RELENTLESS ADVOCACY, PLLC, Brentwood, Tennessee, for Appellant. Allison L. Bussell, METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, Nashville, Tennessee, for Appellees. **ON BRIEF:** Kyle Mothershead, Brian Daniel Mounce, RELENTLESS ADVOCACY, PLLC, Brentwood, Tennessee, for Appellant. Allison L. Bussell, Melissa Roberge, METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, Nashville, Tennessee, for Appellees.

**OPINION**

MATHIS, Circuit Judge.  This case arises out of an unfortunate incident in which Melissa Wooden, in the throes of a mental-health crisis, called 911 and asked for police to kill her.  Three police officers responded and saw Wooden holding a bat and a pickaxe.  One of the officers told Wooden that she would not be harmed.  Less than ten minutes after arriving at the scene, that officer tased Wooden and another officer shot her.

Michael Chrestman, on Wooden's behalf, sued the two officers who harmed her and the Metropolitan Government of Nashville and Davidson County ("Metro Nashville") under 42 U.S.C. § 1983 alleging excessive force, in violation of the Fourth Amendment.  The officers moved to dismiss the complaint, asserting qualified immunity.  The district court granted the officers' motion to dismiss and Metro Nashville's motion for judgment on the pleadings.  Because the complaint plausibly alleges that the officers violated Wooden's clearly established rights when they tased and shot her, and because the district court erred in granting Metro Nashville's motion, we reverse in part and vacate in part.

**I.**

The district court ruled in the defendants' favor at the motion-to-dismiss stage.  So we recite the facts as Chrestman alleged them in the complaint.  *See Savel v. MetroHealth Sys.*, 96 F.4th 932, 937 (6th Cir. 2024).

On March 12, 2021, Wooden called 911 and asked for police to come to her address to shoot her.  At the time, she was experiencing a mental-health crisis.  Metro Nashville Police Department dispatched Officers Benjamin Williams, Brandon Lopez, and Thomas Denenea. Williams was informed over dispatch that Wooden had a pickaxe and a baseball bat.

The three officers arrived at the scene.  Wooden, as Williams had been told, was carrying a pickaxe and a bat.  Williams, Lopez, and Denenea began talking to Wooden, maintaining a distance of about fifteen feet from her.  Lopez drew his firearm.  Denenea pulled out his taser.

No. 24-6018         *Chrestman v. Metro Gov't of Nashville &*         Page 3
                    *Davidson Cnty., Tenn., et al.*

Williams did not initially draw a weapon. The officers told Wooden to back away from them, and she did.

Williams kept talking to Wooden for several minutes. Williams told Wooden repeatedly that none of the officers would hurt her and that he had no reason to draw his weapon because there was distance between them.

Five minutes into the encounter, Wooden's mother drove an electric cart down the driveway and informed Williams that Wooden was not a bad person, but that she was "mentally ill." R. 1, PageID 11. Echoing his earlier words, Williams told Wooden's mother that "the officers would resolve the situation . . . peacefully." *Id.* at 12.

Wooden continued backing away from the officers. The officers kept moving toward Wooden so that they stayed about fifteen feet from her. After Wooden's mother drove her cart close to Wooden, Williams ordered the mother to stop and back away, which she did. Williams then pulled out his taser, motioned to the other officers, and shouted, "Tase her tase her tase her!" *Id.* Williams fired his taser at Wooden. Williams would say later that he "gave up" and "popped" Wooden because the situation "wasn't going anywhere." *Id.* at 13, 15 (citation modified).

At least one of the taser probes struck Wooden, shocking her. Wooden remained standing and began moving in Williams's direction. Lopez responded by shooting at Wooden multiple times, striking her twice. When confronted by Wooden's mother, Williams described Wooden's movements as "charging" the officers and running toward him with the pickaxe. *Id.* at 13. Williams reported over the radio that Wooden was shot and requested medical assistance. Wooden survived but sustained severe injuries that required several surgeries and a two-month hospital stay. Body-cam and dashcam video captured the incident.

Chrestman, as next friend to Wooden, sued Williams, Lopez, and Metro Nashville under 42 U.S.C. § 1983 for excessive force, in violation of the Fourth Amendment. Chrestman also sued Metro Nashville for negligence arising out of the shooting. Defendants sought dismissal or summary judgment on all claims against them. The district court granted the motion to dismiss as to the excessive-force claims against Williams and Lopez and the negligence claim against

Metro Nashville but denied the motion as to the § 1983 claim against Metro Nashville. Metro Nashville later moved for judgment on the pleadings, which the district court granted. Chrestman appeals the dismissal of the § 1983 claims.

## II.

We review de novo a district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) on qualified-immunity grounds. *Linden v. City of Southfield*, 75 F.4th 597, 601 (6th Cir. 2023). A party bringing a claim must provide "a short and plain statement" showing that he "is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under this pleading standard, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When reviewing a district court's dismissal of a complaint based on qualified immunity, we must determine "whether the complaint alleges violation of a clearly established constitutional right." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016) (quotation omitted). The plaintiff "bears the burden of showing that a defendant is not entitled to qualified immunity." *MacIntosh v. Clous*, 69 F.4th 309, 315 (6th Cir. 2023). But that burden is "not high" at the motion-to-dismiss stage—the plaintiff need show only that it is "plausible that an official's acts violated a clearly established constitutional right." *Id.* (citation modified). To that end, we have cautioned that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity. Although an officer's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Anders v. Cuevas*, 984 F.3d 1166, 1175 (6th Cir. 2021) (citation modified).

## III.

Chrestman asserts Fourth Amendment excessive-force claims against Williams and Lopez. The Fourth Amendment, applicable to the States through the Fourteenth Amendment, prohibits unreasonable seizures by police officers. U.S. Const. amend. IV; *Maryland v. Pringle*,

540 U.S. 366, 369 (2003). An unreasonable seizure includes an officer's use of excessive force against a person. *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015). The use of force becomes excessive when the officer's actions are not "objectively reasonable in light of the facts and circumstances confronting" him, without considering the officer's "underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (citation modified); *see also Barton v. Martin*, 949 F.3d 938, 952 (6th Cir. 2020) ("Whether an officer exerts excessive force is determined under an objective reasonableness standard." (citation modified)). We judge objective reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. And we consider "only the facts that were knowable" to the officer at the time. *White v. Pauly*, 580 U.S. 73, 77 (2017) (per curiam) (citation omitted).

Determining the "reasonableness of police force requires analyzing the totality of the circumstances." *Barnes v. Felix*, 145 S. Ct. 1353, 1358 (2025) (citation modified). The Supreme Court directed courts to consider a nonexhaustive list of factors for this inquiry: (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

But as courts encountered scenarios that did not track neatly the above factors, more tailored factors emerged. In the mental-health-emergency context, these factors include: (1) whether the person was "experiencing a medical emergency that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others"; (2) whether "some degree of force [was] reasonably necessary to ameliorate the immediate threat"; and (3) whether "the force used [was] more than reasonably necessary under the circumstances (i.e., was it excessive)." *Est. of Hill ex rel. Hill v. Miracle*, 853 F.3d 306, 314 (6th Cir. 2017).

Williams and Lopez assert qualified-immunity defenses. In reviewing the dismissal of a claim on qualified-immunity grounds, "the first step is to determine if the facts alleged make out a violation of a constitutional right," and "the second is to ask if the right at issue was clearly

established when the event occurred such that a reasonable officer would have known that his conduct violated it." *Courtright*, 839 F.3d at 518 (citation modified). We "consider each officer's entitlement to qualified immunity separately." *Hodges v. City of Grand Rapids*, 139 F.4th 495, 517 (6th Cir. 2025) (quotation omitted). But we no longer apply the segmented approach, where we "carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage." *Id.* (quotation omitted). Instead, "to assess whether an officer acted reasonably in using force," we "consider all the relevant circumstances, including facts and events leading up to the climactic moment." *Barnes*, 145 S. Ct. at 1356 (citation modified).

### A.

*The Tasing*. Chrestman argues that Williams used excessive force against Wooden by tasing her. Officers may use nonlethal force, including tasing, if they have an "objective justification" for doing so. *See Gaddis ex rel. Gaddis v. Redford Township*, 364 F.3d 763, 774 (6th Cir. 2004). "We have found tasing reasonable where individuals were particularly violent or physically resistant, so as to endanger responders." *Kent v. Oakland County*, 810 F.3d 384, 391 (6th Cir. 2016) (citation modified). An officer can tase someone who "actively resists arrest." *Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015). We have determined that a person engaged in active resistance "where some outward manifestation—either verbal or physical—on the part of the suspect had suggested volitional and conscious defiance." *Jackson-Gibson v. Beasley*, 118 F.4th 848, 856 (6th Cir. 2024) (quotation omitted). "Noncompliance alone does not indicate active resistance; there must be something more." *Goodwin v. City of Painesville*, 781 F.3d 314, 326 (6th Cir. 2015) (citation modified). An officer cannot tase someone who does not actively resist arrest or has stopped resisting arrest. *Rudlaff*, 791 F.3d at 642.

Chrestman plausibly alleges that Williams violated Wooden's constitutional rights when he tased her. Wooden, who was experiencing a mental-health crisis, called 911 and asked that police come and shoot her. Williams was one of the officers who arrived on the scene. When Williams arrived, Wooden held a bat and a pickaxe. Williams did not draw a weapon on Wooden initially, as Wooden maintained a distance of about fifteen feet from the officers.

Wooden's mother came to the scene in an electric cart and began communicating with Wooden and Williams. Williams tased Wooden shortly after Wooden's mother drove her cart near Wooden, though by that time Wooden's mother had backed away from her daughter.

We turn first to the *Graham* factors. Accepting the allegations in the complaint as true, the factors weigh in Chrestman's favor. The first factor—the severity of the crime at issue—favors Chrestman because Wooden was not committing a crime when she was tased. So does the second factor, as nothing in the complaint suggests that Wooden posed a threat to the officers or others on the scene. The third *Graham* factor also supports Chrestman—Wooden was not under arrest, so she could not have resisted arrest or attempted to flee arrest.

Because the complaint indicates that Wooden was suffering a mental-health crisis and because Wooden had not committed a crime, we also consider the *Hill* factors. But we must exercise caution in applying those factors at the motion-to-dismiss stage, where we consider only the factual allegations in the complaint. As to the first *Hill* factor, the complaint indicates that Wooden was experiencing a medical emergency, but the complaint does not indicate that Wooden posed a danger to anyone except herself. As to the second factor, the well-pleaded facts do not indicate that some degree of force was necessary to ameliorate an immediate threat. Specifically, the complaint does not describe an immediate threat. Wooden, although she held weapons, maintained her distance from the officers. And Williams had not drawn a weapon for most of the time that he was on the scene. As to the third factor, Chrestman has alleged facts indicating that Williams's tasing of Wooden was excessive. No other officer on the scene used force against Wooden at that time. Williams would later explain that he tased Wooden after he "gave up." R. 1, PageID 15 (citation modified). Ultimately, the test is an objective one, not a subjective evaluation. But absent an officer's reasonable fear for his safety, simple disobedience by an individual not under arrest does not justify tasing. *Wright v. City of Euclid*, 962 F.3d 852, 868–69 (6th Cir. 2020).

Williams argues that the body-cam and dashcam footage of the encounter with Wooden blatantly contradicts the complaint and shows that Chrestman has not pleaded a plausible excessive-force claim against him. Specifically, Williams argues that the video evidence shows

No. 24-6018     *Chrestman v. Metro Gov't of Nashville &*     Page 8
                *Davidson Cnty., Tenn., et al.*

that, despite Williams's efforts to de-escalate the situation, Wooden maintained an aggressive posture while holding the bat and pickaxe and made statements to try to provoke the officers to shoot her, demonstrating that she was a danger to herself. Williams further argues that the videos show that Wooden moved the bat and pickaxe over her shoulder as if planning to swing them just before Williams tased her, which Lopez reasonably perceived as an imminent danger to Williams.

We can consider the videos only on a limited basis when reviewing a district court's decision on a motion to dismiss in the qualified-immunity context. *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022). If an officer disputes the complaint's version of the facts, "we can only rely on the videos over the complaint to the degree the videos are clear and blatantly contradict or utterly discredit the plaintiff's version of events." *Id.* (citation modified). This limitation applies "even if available video evidence would save time and effort or would easily resolve a case." *Hodges*, 139 F.4th at 510 (citation modified).

As to the arguments raised by Williams, the videos do not blatantly contradict or utterly discredit the complaint's allegations. The complaint indicates that Wooden held a bat and a pickaxe during the standoff with the officers and that Williams tried to defuse the standoff by stating that "none of the officers would hurt [Wooden]" and that "he had no reason to pull a weapon on her." R. 1, PageID 10–11. True, the complaint does not mention that Wooden placed the bat and pickaxe on her shoulder shortly before she was tased. But that omission does not contradict or discredit the complaint because Wooden was backing away from the officers when she lifted the bat and pickaxe, and she had lowered the weapons from her shoulder when Williams tased her.

More to the point, the video evidence does not change our analysis of the application of the *Graham* and *Hill* factors. Chrestman has plausibly alleged that Williams violated Wooden's Fourth Amendment right to be free from excessive force when Williams tased Wooden. Further factual development could eventually show that Williams's actions were objectively reasonable, but at the motion-to-dismiss stage, Chrestman has pleaded sufficiently that Williams violated Wooden's constitutional rights.

**B.**

*The Shooting.* We turn next to Chrestman's Fourth Amendment excessive-force claim against Lopez. Chrestman claims that Lopez violated Wooden's constitutional rights by shooting Wooden seconds after Williams tased her. "A police officer's use of deadly force violates the Fourth Amendment when it is not objectively reasonable." *Barnes*, 145 S. Ct. at 1356 (citation omitted). An officer may use deadly force when he "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Assessing reasonableness when deadly force is involved requires considering the totality of the circumstances. *Barnes*, 145 S. Ct. at 1356; *Palma v. Johns*, 27 F.4th 419, 432 (6th Cir. 2022). We consider the following nonexhaustive list of factors in conducting the totality-of-the-circumstances analysis in deadly force cases:

> (1) why the officer was called to the scene; (2) whether the officer knew or reasonably believed that the person was armed; (3) whether the person verbally or physically threatened the officer or disobeyed the officer; (4) how far the officer was from the person; (5) the duration of the entire encounter; (6) whether the officer knew of any ongoing mental or physical health conditions that may have affected the person's response to the officer; and (7) whether the officer could have [defused] the situation with less forceful tactics.

*Palma*, 27 F.4th at 432 (citation modified).

The complaint alleges that Lopez had drawn his service firearm during the standoff with Wooden before Williams tased her. It also alleges that after Williams tased Wooden, Lopez reacted by shooting at Wooden, striking her twice. But the complaint omits what took place immediately after Williams tased Wooden—Wooden moved in Williams's direction. The video evidence shows this. Because Wooden's movement in Williams's direction blatantly contradicts the complaint's omission on this point, we can consider this part of the video evidence in assessing the sufficiency of the complaint. *See Bell*, 37 F.4th at 366. That said, the video evidence is unclear about how close Wooden moved toward Williams. It is also unclear about whether Wooden's movement was intentional, or whether it was involuntary movement caused by the shock from the taser. With this background, we consider each applicable *Palma* factor in turn.

No. 24-6018         *Chrestman v. Metro Gov't of Nashville &*         Page 10
                    *Davidson Cnty., Tenn., et al.*

We discuss the first and sixth factors together. Those factors ask us to consider why Lopez was called to the scene and whether he knew about mental-health conditions impacting Wooden's response to the officers. Lopez and the other officers were called to the scene in response to Wooden calling 911 because she wanted officers to shoot her. On the scene, Wooden's mother disclosed to the officers that Wooden was "mentally ill." R. 1, PageID 11. When an officer responds to "wellness checks or other non-criminal calls," we consider "what the officer learned and observed about the situation before the officer even engaged with anyone on the scene." *Palma*, 27 F.4th at 432. The officers here were not responding to a past or ongoing crime. And the complaint indicates that Lopez knew Wooden was experiencing a "mental health crisis" at the time of the shooting. *Id.* at 10.

We also discuss factors two and four together: whether the officers knew that Wooden was armed and the distance between the officers and Wooden. The officers knew that Wooden was armed with a baseball bat and pickaxe, and she maintained a distance of around fifteen feet from the officers during the standoff, moving back from the officers multiple times. An officer may not shoot a person just because she has a weapon, even a gun, in hand. *Hicks v. Scott*, 958 F.3d 421, 435 (6th Cir. 2020). Whether a suspect has a weapon is just one consideration in assessing the totality of the circumstances. *Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017) ("Where the weapon was, what type of weapon it was, and what was happening with the weapon are all inquiries crucial to the reasonableness determination." (quoting *Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016))).

Factor three asks whether Wooden verbally or physically threatened the officers. Lopez argues that Wooden physically threatened Williams when she charged at him after Williams tased her. Chrestman says that Wooden took just two steps in Williams's direction after the tasing. The video evidence does not definitively resolve this ambiguity. So at this stage, viewing the complaint and the pertinent video footage in Chrestman's favor, we acknowledge simply that Wooden moved toward Williams after he tased her. *Cf. LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022).

As for factor five, the duration of the entire encounter lasted approximately six minutes.

The seventh *Palma* factor asks whether the officers could have defused the situation with Wooden before employing deadly force. Without factual development, it is difficult to assess this factor. Lopez shot Wooden seconds after Williams tased her. But, notably, neither Williams—who Wooden allegedly "charged" at—nor Denenea used deadly force. We consider the reaction of other officers to a perceived threat. *See Heeter v. Bowers*, 99 F.4th 900, 914 (6th Cir. 2024) (reasoning that another officer's failure to use deadly force when he similarly perceived the events undercut the defendant officer's assertion that the plaintiff created an imminent threat of harm). According to the complaint, Williams said that the fact that he did not draw his gun spoke to "his state of mind as to whether or not he was in fear that Wooden would kill him." R. 1, PageID 15. When Wooden's mother asked Williams why Lopez opened fire, Williams said that "[he] saw it the way [he] saw it, [Lopez] saw it the way [Lopez] saw it." *Id.* at 14. "That neither [Williams nor Denenea] thought it appropriate to fire at [Wooden] cuts against [Lopez's] assertion that he reasonably perceived an imminent threat." *Heeter*, 99 F.4th at 914.

All in all, accepting the complaint's allegations as true—except where we have determined that the video evidence contradicts the complaint—and considering the *Palma* factors on this sparse record, we conclude that Chrestman has plausibly alleged a Fourth Amendment excessive-force claim against Lopez. Wooden, while suffering a mental-health crisis, called officers to the scene to shoot her. Although Wooden carried a bat and a pickaxe, Lopez was the only responding officer to draw a deadly weapon. Wooden maintained distance from the officers, only moving toward Williams after he tased her. The reason for Wooden's movement might emanate from discovery. Discovery might also reveal whether a reasonable officer would have perceived an imminent threat of deadly force under the circumstances.

## C.

Although Chrestman has plausibly alleged that Williams and Lopez violated Wooden's constitutional rights, the officers are entitled to qualified immunity unless Wooden's constitutional rights were clearly established at the time of the incident. For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640

(1987). This means that "existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 580 U.S. at 79 (quotation omitted). That said, we need not identify a perfect match to the facts and circumstances of this case. *Id.*; *Palma*, 27 F.4th at 442. But we must be confident in saying that "in the light of pre-existing law the unlawfulness [was] apparent," *Anderson*, 483 U.S. at 640, such that a reasonable officer would have known that his alleged conduct was unlawful, *Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017). In other words, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *White*, 580 U.S. at 79 (quotation omitted). "The specific acts or conduct at issue need not previously have been found unconstitutional for a right to be clearly established law." *Baynes v. Cleland*, 799 F.3d 600, 614 (6th Cir. 2015) (citation modified).

That this case comes to us at the motion-to-dismiss stage complicates our analysis of the clearly established prong of the officers' qualified-immunity defense. "Development of the factual record is frequently necessary to decide whether the official's actions violated clearly established law." *MacIntosh*, 69 F.4th at 315 (citation modified). Absent such development, "a court cannot fairly tell whether a case is obvious or squarely governed by precedent," hindering our ability to determine "whether a right is clearly established." *Guertin v. Michigan*, 912 F.3d 907, 917 (6th Cir. 2019) (citation modified).

**1.**

We consider first whether Williams's taser use violated law that was clearly established at the time of the subject incident in 2021. As of that time, there was "a clearly established right not to be tased when" a person "is not actively resisting arrest." *Wright*, 962 F.3d at 870 (collecting cases). We have also held that "the gratuitous or excessive use of a taser violates a clearly established constitutional right." *Goodwin*, 781 F.3d at 327 (citation modified). This is particularly so "when the claimant was never told he was under arrest and posed little safety threat to officers." *Kent*, 810 F.3d at 396 (citing *Goodwin*, 781 F.3d at 326). Also bear in mind that an officer must account for a person's "apparent mental state" when using nonlethal force. *Gaddis*, 364 F.3d at 775.

No. 24-6018      *Chrestman v. Metro Gov't of Nashville &*      Page 13
*Davidson Cnty., Tenn., et al.*

Based on the allegations in the complaint, Wooden was: (1) not under arrest, (2) not resisting arrest, (3) suffering a mental-health crisis, and (4) nonviolent. Chrestman has therefore "ma[de] out a plausible claim" that Williams tasing Wooden "violated a constitutional right that was clearly established at the time of the violation." *Gavitt v. Born*, 835 F.3d 623, 641 (6th Cir. 2016) (citation omitted).

**2.**

We reach a similar conclusion on Lopez's use of deadly force against Wooden. Officers may not use lethal force simply because someone disobeys their orders. *See Wright*, 962 F.3d at 868–69. "It is axiomatic that individuals have a clearly established right not to be shot absent probable cause to believe that they pose a threat of serious physical harm, either to the officer or to others." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (citation modified). By 2018, it was clearly established "that, even if [a suicidal individual] was armed and had disobeyed the officers' commands, these facts do not alone amount to a threat of serious or deadly harm." *Heeter*, 99 F.4th at 915.

As stated above, accepting the facts in the light most favorable to Chrestman, Wooden, while experiencing a mental-health crisis: (1) asked police officers to shoot her, (2) wielded a bat and a pickaxe at a distance from the officers, and (3) moved toward Williams while still holding her weapons after Williams tased her. The degree of aggression she showed in that movement is ambiguous from the video and could benefit from further factual development. But based on the complaint's allegations, Wooden's actions do not "amount to a threat of serious or deadly harm." *Id.* Thus, the complaint plausibly alleges that Lopez violated Wooden's clearly established right to be free from excessive force.

**3.**

Williams and Lopez make several arguments in response. We reject each argument.

First, Williams and Lopez argue that *Palma v. Johns* cannot clearly establish rights as to the tasing or the shooting because we decided *Palma* after the events of this case. But we rely on *Palma* only to show that Chrestman has pleaded sufficiently that the shooting violated Wooden's

constitutional rights. We do not rely on *Palma* for our analysis of the clearly established prong for the tasing or the shooting.

Second, Lopez seems to argue that our decision in *Caie v. West Bloomfield Township* shows that Chrestman has not plausibly alleged the violation of a clearly established right for the tasing. 485 F. App'x 92 (6th Cir. 2012). In *Caie*, we held that an officer's use of a taser did not violate the plaintiff's constitutional rights when the officer deployed his taser after the plaintiff: (1) "repeatedly told the officers that he wanted to die and asked what he would have to do to get them to shoot him"; (2) threatened to "fight the officers so that they would have a reason to kill him"; (3) experienced "dramatic mood swings, ranging from sad and crying and upset . . . to hostile and violent and threatening"; (4) began running from officers until they took him to the ground; and (5) refused to move his arms behind his back so the officers could handcuff him. *Id.* at 94 (citation modified).

*Caie* is easily distinguishable. We decided *Caie* at the summary-judgment stage, not the motion-to-dismiss stage. *Id.* at 95. We also did not reach the clearly established analysis; we instead held that the plaintiff's evidence failed to establish a constitutional violation. *Id.* at 97 & n.3. So *Caie* does not affect our analysis of whether Wooden's rights were clearly established.

Third, Williams and Lopez, relying on *Crawford v. Tilley*, 15 F.4th 752 (6th Cir. 2021), argue that although we have repeatedly cautioned district courts against granting qualified immunity at the motion-to-dismiss stage, there is no presumption against courts doing so. *Crawford* actually cuts against the officers. There, we explained that "dismissing for qualified immunity" on the clearly established prong "is sometimes difficult because the clearly established inquiry may turn on case-specific details that must be fleshed out in discovery." *Id.* at 765. And *Crawford* specifically mentions tasing cases as an example of the type of case that can benefit from factual development. *Id.* Of course, the officers argue that further factual development is unnecessary because video evidence captures the tasing and the shooting. But, as we have explained, we are limited in our ability to rely on the video evidence when reviewing the sufficiency of the complaint.

No. 24-6018 *Chrestman v. Metro Gov't of Nashville & Davidson Cnty., Tenn., et al.* Page 15

## IV.

We turn finally to Chrestman's § 1983 *Monell*[1] liability claim against Metro Nashville. The complaint alleges that Metro Nashville is liable for Williams's and Lopez's actions by engendering a "culture of fear, violence, and impunity"; failing to reform use-of-force policies for mental-health emergencies; failing to investigate/discipline; and failing to train. R. 1, PageID 17. When, as here, "a municipality's alleged responsibility for a constitutional violation stems from an *employee's* unconstitutional act," a claimant must show that the municipality's failure to prevent harm was "deliberate under 'rigorous requirements of culpability and causation.'" *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 415 (1997)). "The violated right . . . must be clearly established because a municipality cannot *deliberately* shirk a constitutional duty unless that duty is clear." *Id.* (citation omitted). And so "a municipal policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established." *Id.* at 994 (quotation omitted).

The district court dismissed Chrestman's municipal-liability claim for the same reason it concluded that Williams and Lopez were entitled to qualified immunity—the constitutional rights at issue were not clearly established. But because we hold that Chrestman has plausibly alleged that Williams and Lopez violated Wooden's clearly established rights, we revive Chrestman's municipal-liability claim against Metro Nashville.

## V.

We **REVERSE** the district court's order dismissing Chrestman's claims against Williams and Lopez. We **VACATE** the district court's order granting Metro Nashville judgment on the pleadings. We **REMAND** to the district court for proceedings consistent with this opinion.

---

[1]*Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 24-6018

MICHAEL CHRESTMAN, as Next Friend to Melissa Wooden,

   Plaintiff - Appellant,

v.

METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE; BENJAMIN WILLIAMS; BRANDON LOPEZ,

   Defendants - Appellees.

**FILED**
Sep 16, 2025
KELLY L. STEPHENS, Clerk

Before: GILMAN, DAVIS, and MATHIS, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is REVERSED IN PART, VACATED IN PART, and REMANDED for further proceedings consistent with the opinion of this court.

ENTERED BY ORDER OF THE COURT

Kelly L. Stephens, Clerk